## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA and<br>THE STATE OF INDIANA,<br><br>        Plaintiffs,<br><br>        v.<br><br>COUNTRYMARK COOPERATIVE, L.L.P.,<br><br>        Defendant. | ) <br> ) <br> )  **Civil Action No.**<br> ) <br> ) <br> ) <br> )  **1:09-cv-1018SEB-TAB**<br> ) <br> ) <br> ) |

### CONSENT DECREE

### I. BACKGROUND

A.      The United States of America ("United States"), on behalf of the Secretary of the United States Department of the Interior ("DOI"), acting through the United States Fish and Wildlife Service ("FWS"), and the United States Coast Guard, National Pollution Funds Center ("NPFC"); and the State of Indiana ("State"), on behalf of the Indiana Department of Environmental Management ("IDEM") and the Indiana Department of Natural Resources ("IDNR") (collectively, "Plaintiffs"), filed a Complaint in this action, concurrently with this Consent Decree, against Countrymark Cooperative, L.L.P. ("Countrymark" or "Settling Defendant") pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, and the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701, *et seq.*, seeking recovery of natural resource damages caused by the discharge of crude oil from a pipeline owned by Countrymark into the former oxbow of the Wabash River near Griffin, Indiana, in May of 2003 (the "Oil Spill," as defined below).

B.      The Countrymark Cooperative, LLP petroleum refinery is located in Mt. Vernon,

Indiana, where it has been continuously operated for more than 50 years.

C.     Countrymark owns 238 miles of pipeline through which it transports oil across the country from wells located in Illinois, Indiana, and Kentucky.

D.     The Oil Spill occurred in early May 2003 in a part of the Wabash River floodplain known as Goose Pond. Goose Pond is located near Griffin, Indiana, in a rural agricultural area, approximately two miles from the nearest residence.

E.     On June 9, 2003, Countrymark reported the Oil Spill to the National Response Center of the United States Coast Guard.

F.     Within days following the reporting of the Spill, the FWS, IDEM, and IDNR began a cooperative effort with Countrymark to assess the natural resource damages resulting from the discharge of oil.

G.     The U.S. Coast Guard's National Pollution Fund Center provided funding to the FWS for the purpose of assessing natural resource damages from the Spill. The FWS estimated that approximately 300 acres of land, in addition to adjacent wetlands and floodplains, were impacted by the Oil Spill.

H.     In June of 2003, Settling Defendant attempted to remediate the effects of the Oil Spill by using vacuum trucks, drum skimmers and backhoes to remove crude oil, constructing an underflow dam to prevent flooding, draining still water, and removing trees and beaver dams. Settling Defendant was not able to remediate all of the area impacted by the Oil Spill, however, due to the remote location of the area.

I.     The United States, the State, and Settling Defendant (collectively, the "Parties") have agreed that it is appropriate for Settling Defendant to resolve its alleged liability for natural

resource damages arising from the Oil Spill through this Consent Decree which provides for the performance of restoration work and the reimbursement of the costs incurred in assessing damages to natural resources in connection with the Oil Spill.

J.      This Consent Decree is a settlement of a contested matter, and the Parties agree that neither this Consent Decree, nor any part hereof, nor entry into, nor any performance under this Consent Decree by Settling Defendant, shall constitute or be construed as a finding or admission of any fact or law by Settling Defendant or by its officers, directors, employees or agents.

K.      The Parties further agree, and the Court finds, that this Consent Decree has been negotiated by the Parties in good faith; it is fair, reasonable, and in the public interest; and it will avoid prolonged and complicated litigation between the Parties.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed as follows:

## II.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367 and 33 U.S.C. §§ 1321 and 2717(b).  This Court also has personal jurisdiction over Countrymark Cooperative L.L.P.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) and 33 U.S.C. § 2717(b).

2.      Solely for the purposes of this Consent Decree and the underlying Complaint, Countrymark waives all objections that it may have to jurisdiction of the Court or to venue in this District.  Countrymark shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

3

### III. **PARTIES BOUND**

3.     This Consent Decree is binding upon the United States, the State of Indiana and

the Settling Defendant, and their successors and assigns.  Any change in ownership or corporate

or other legal status, including, but not limited to, any transfer of assets of real or personal

property, shall in no way alter the status or responsibilities of the Settling Defendant under this

Consent Decree.

### IV. **DEFINITIONS**

4.     Unless otherwise defined herein, terms used in this Consent Decree which are

defined in OPA or the CWA, and in regulations promulgated pursuant to OPA (including 15

C.F.R. Part 990 and 33 C.F.R. Part 136) or the CWA, shall have the meaning assigned to them

therein.  In addition, whenever the following terms are used in this Consent Decree, they shall

have the meanings set forth below:

(a) "Complaint" shall mean the civil complaint filed in this action by the United States and the

State of Indiana concurrently with the lodging of this Consent Decree.

(b) "Consent Decree" or "Decree" shall mean this Consent Decree and the appendix attached

hereto, which is incorporated herein by reference.

(c) "CWA" shall mean the Clean Water Act, as amended, 33 U.S.C. § 1251 *et seq.*

(d) "Day" shall mean a calendar day unless expressly stated to be a work day elsewhere in this

Decree.  In computing any period of time under this Agreement, where the last day would fall on

a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next

working day.

(e) "Date of Lodging" shall mean the date this Consent Decree is lodged with the Court.

4

(f) "DOI" shall mean the United States Department of the Interior and any successor departments or agencies of the United States.

(g) "DOI Assessment Costs" shall mean all costs that DOI has incurred and paid by the date of lodging of this Consent Decree in connection with the assessment of the Natural Resource Damages resulting from the Oil Spill.

(h) "Effective Date" shall mean the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as provided by Section XX (Effective Date) of this Consent Decree.

(i) "Federal Trustee" shall mean DOI acting through the FWS. DOI and FWS have been delegated authority to act as the Federal Trustees for natural resources impacted by the Oil Spill pursuant to Executive Order 12580, as amended by Executive Order 12777.

(j) "Future Costs" shall mean all costs that the United States or the State incur in reviewing plans, reports and other items pursuant to this Consent Decree, verifying completion of the restoration work in the SOW pursuant to Paragraph 9, or otherwise implementing, overseeing, or enforcing this Consent Decree.

(k) "FWS" shall mean the United States Fish and Wildlife Service.

(l) "IDEM" shall mean the Indiana Department of Environmental Management and any successor departments or agencies of the State of Indiana.

(m) "IDNR" shall mean the Indiana Department of Natural Resources and any successor departments or agencies of the State of Indiana.

(n) "Interest" shall mean interest at the rate specified pursuant to OPA Section 1005, 33 U.S.C. § 2705.

5

(o)  "Natural Resource(s)" shall mean land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and all other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States or the State.

(p) "Natural Resource Damages" shall mean "damages" as defined in OPA, Section 1002(b)(2)(A),  33 U.S.C. § 2702(b)(2)(A), and the relevant provisions of Indiana state law, including Indiana Code 13-11-2-137 and 13-11-2-49.  Natural Resources Damages includes, but is not limited to, DOI Assessment Costs, State Assessment Costs, and NPFC Assessment Costs.

(q) "Natural Resource Trustees" or "Trustees" shall mean the United States Department of Interior, acting through the U.S. Fish and Wildlife Service, and the State, acting through co-trustees IDNR and IDEM.

(r)  "NFPC" shall mean the U.S. Coast Guard's National Pollution Funds Center.

(s)  "NPFC Assessment Costs" shall mean all costs that the U.S. Coast Guard National Pollution Funds Center has incurred and paid by the date of lodging of this Consent Decree in connection with the assessment of Natural Resource Damages resulting from the Oil Spill.

(t)  "Oil Spill" or "Spill" shall mean the discharge of crude oil from Settling Defendant's pipeline into the former oxbow of the Wabash River in Gibson County near Griffin, Indiana, in May of 2003, and which Settling Defendant reported to the United States Coast Guard on June 9, 2003.

(u) "OPA" shall mean the Oil Pollution Act of 1990, as amended, 33 U.S.C.

§ 2701, *et seq.*

(v) "OSLTF" or "Spill Fund" shall mean the Oil Spill Liability Trust Fund established under 26 U.S.C. § 9509, and administered by the U.S. Coast Guard's National Pollution Funds Center.

(w) "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral.

6

(x) "Parties" shall mean the United States, the State of Indiana, and the Settling Defendant.

(y) "New Harmonie Park Restoration Statement of Work" or "Restoration SOW" shall mean the work to be performed under this Consent Decree as set forth in Appendix A, including (1) the removal of approximately 16 wells, two pump houses, two tank battery units, flow lines and oil field refuse at the New Harmonie State Park; and (2) restoration of the affected land.

(z) "Section" shall mean a portion of this Consent Decree identified by an uppercase Roman numeral.

(aa) "Settling Defendant" shall mean Countrymark Cooperative, LLP, a Delaware partnership, registered to conduct business in the State of Indiana.

(bb) "Site" shall mean the approximately 300 acre area, which was impacted by the Oil Spill, including the adjacent wetlands and floodplains.

(cc) "State" shall mean the State of Indiana, its agencies and instrumentalities, including the Indiana co-trustees for Natural Resource Damages, IDEM and IDNR.

(dd) "State Assessment Costs" shall mean all costs that IDEM and IDNR have incurred and paid by the date of lodging of this Consent Decree in connection with the assessment of the Natural Resource Damages resulting from the Oil Spill.

(ee) "State Trustees" shall mean IDEM and IDNR, which have been delegated authority to act as State Trustees for natural resources impacted by the Oil Spill.

(ff) "United States" shall mean the United States of America, including its departments, agencies and instrumentalities.

(gg) "Trustees" shall mean DOI, IDNR, and IDEM.

7

## V. **PURPOSE**

5.      This Consent Decree provides the terms upon which the Parties agree to resolve State and Federal claims for Natural Resource Damages, including assessment costs, against the Settling Defendant for alleged injuries to, destruction of, or loss of Natural Resources and the services they provide as a result of the Oil Spill.

## VI. **OBLIGATIONS OF SETTLING DEFENDANT**

6.      Performance of Restoration Work

a.      Settling Defendant shall finance and perform the work specified in the New Harmonie State Park Restoration Statement of Work ("Restoration SOW"), attached hereto as Appendix A, in accordance with the plans, standards, and specifications, set forth therein or developed by Settling Defendant and approved by the Trustees pursuant to this Consent Decree.

b.      Settling Defendant shall commence performance of the Restoration SOW no later than one year after the Effective Date and shall complete all activities specified in the Restoration SOW within three years, unless performance of the work is delayed by a Force Majeure Event pursuant to Section X.

7.      Project Coordinators and Contractors

a.      Within 30 days of the Effective Date, Settling Defendant and the Trustees shall notify each other, in writing, of the name, address and telephone number of their respective designated Project Coordinators and Alternate Project Coordinators. If a Party wishes to change a Project Coordinator or Alternate Project Coordinator, the identity of the successor will be given to the other Parties in writing at least 5 working days before the change occurs. Settling Defendant's Project Coordinator shall have the technical expertise sufficient to adequately

8

oversee all aspects of implementing the Restoration SOW, and shall be subject to the approval of the Trustees.

      b.      All contractors retained or utilized by Settling Defendant, including without limitation, general contractors, subcontractors, and wholesalers that will implement any significant aspect of the Restoration SOW, shall be subject to disapproval by the Trustees. Settling Defendants shall notify the Trustees in writing of the name, title, and qualifications of any such contractor or supplier twenty days prior to commencement of the work for which they have been retained. The Trustees will issue a notice of disapproval or authorization to proceed with the work with respect to each proposed contractor or supplier.

      c.      If the Trustees disapprove a proposed contractor or supplier, the Trustees will notify Settling Defendant, in writing, setting forth the reasons for disapproval. If the Trustees determine that the reasons for disapproval should be kept confidential, the Trustees may disclose the reasons for disapproval only to counsel for the Settling Defendant, who shall not disclose the reasons for disapproval to any other person. Settling Defendant shall submit to the Trustees a list of alternative contractors or suppliers, including the qualifications of each contractor or supplier, within thirty (30) day of receipt of the Trustees' notice of disapproval. The Trustees will provide written notice of the names of any contractor(s) or supplier(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. Settling Defendant may select any contractor or supplier from the list that is not disapproved and shall notify the Trustee of the name of the contractor or supplier selected within 21 days of the Trustees' authorization to proceed.

      d.      Settling Defendant shall provide a copy of this Consent Decree to each contractor and subcontractor retained to perform work under this Consent Decree and to each

person representing Settling Defendant with respect to the work required under this agreement. Settling Defendant shall be responsible for ensuring that its contractors and subcontractors perform the work contemplated herein in accordance with the terms and conditions set forth in this Consent Decree.

8.    All activities undertaken by Settling Defendant pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and state laws and regulations. Where any portion of the work requires a federal or state permit or approval, Settling Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such approvals. This Consent Decree is not, and shall not be construed to be a permit or approval issued pursuant to any federal or state statute or regulation.

9. Within thirty (30) days of completion of all work described in the Restoration SOW, Settling Defendant shall submit a notice of completion to the Trustees. Within sixty (60) days of receiving the Notice of Completion, the Trustees shall inspect the work performed by Settling Defendant. Within sixty (60) days of the inspection, the Trustees shall either provide a written description of any deficiencies or a Construction Completion Certification.

10.    <u>Payment Obligations</u>

a. Within thirty (30) days of the Effective Date of this Consent Decree, Settling Defendant shall pay to the Trustees and NPFC the following amounts as reimbursement for costs incurred in assessing the damages to natural resources resulting from the Oil Spill:

(1) As to the NPFC, Settling Defendant shall make a payment in the amount of $15,651.94 for the reimbursement of NPFC Assessment Costs. Payment shall be sent by Fedwire Electric Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with instructions to be provided to Settling Defendant by the Financial Litigation Unit of the U.S.

Attorney's Office for the Southern District of Indiana.  Any payment received by the United

States Department of Justice after 4:00pm Eastern Time shall be credited on the next business

day.  The payment shall reference the case name, DOJ case #90-5-1-1-08445, and Federal

Project Number (FPN) T03001.  Settling Defendant shall simultaneously send written notice of

payment and a copy of any transmittal documentation (referencing DOJ case number 90-5-1-1-

08445 and FPN T03001) to:

> Chief
> Environmental Enforcement Section
> U.S. Department of Justice
> P.O. Box 7611
> Washington, D.C.  20044
> Attn:  DOJ # 90-5-1-1-08445
>
> CDR Thomas Beistle, Chief
> United States Coast Guard, Office of Claims and Litigation
> 2100 Second Street, S.W.
> Washington, D.C.  20593-0001
> Attn: FPN T03001
>
> and
>
> Lieutenant Commander David Dubay, Legal Advisor
> United States Coast Guard, National Pollution Funds Center/CI
> 4200 Wilson Boulevard, Suite 1000
> Washington, D.C.  22203-1804
> Attn: FPN T03001

(2) As to DOI, Settling Defendant shall make payment in the amount of

$1,168.19 for the reimbursement of DOI Assessment Costs.  Payment shall be sent by Fedwire

EFT to the U.S. Department of Justice in accordance with instructions to be provided to Settling

Defendant by the U.S. Attorney's Financial Litigation Unit for the Southern District of Indiana.

Any payment received by the United States Department of Justice after 4:00pm Eastern Time

shall be credited on the next business day.  At the time of payment of the DOI assessment costs,

Settling Defendant shall simultaneously send written notice of payment and a copy of any transmittal documentation, referencing Countrymark Oil Spill, Griffin, Indiana, Account Number 14X5198 (NRDAR), and DOJ case number 90-5-1-1-08445 to:

Chief
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044

U.S. Department of the Interior
Natural Resource Damage Assessment and Restoration Program
Attn: Restoration Fund Manager
1849 "C" St., N. W.  Mail Stop 4449
Washington, D.C.  20240

Kimberly Gilmore
U.S. Department of the Interior
Office of the Solicitor
Three Parkway Center, Room 385
Pittsburgh, PA 15220

(3)  As to the State of Indiana, Settling Defendant shall make a payment of $5,979.99 for the reimbursement of costs incurred in assessing damages to natural resources resulting from the Oil Spill.  Payment shall be sent by Electronic Funds Transfer to the Indiana Department of Environmental Management Hazardous Waste Site State Cleanup (NRD), Account #6130-108900, National City Bank, ABA Routing #07400065.  At the time of payment of the State's assessment costs, Settling Defendant shall simultaneously send written notice of payment and a copy of any transmittal documentation to:

Elizabeth Admire
IDEM
Office of General Counsel
100 North Senate Ave.
MC60-01, IGCN 1307
Indianapolis, IN 46304-2251

b. Payment of Future Costs.

(1)  Countrymark shall pay all Future Costs.  On a periodic basis, DOI, IDNR and IDEM will send Countrymark a bill requiring payment that includes an itemized cost summary, which reflects direct and indirect costs incurred by the United States, including DOJ, and the State, if any.  Countrymark shall make all payments within 30 days of Countrymark's receipt of each bill requiring payment, except as otherwise provided in this subparagraph 10b(3). Countrymark shall make all payments required by this Paragraph in accordance with the instructions set forth in the bill.

(2)  At the time of payment, Countrymark shall send notice that payment has been made to the United States and the State in accordance with Section XVII (Notices and Submissions).

(3)  Disputes Regarding Future Costs.  Countrymark may contest payment of any Future Costs under subparagraph 10b(1) if it determines that the United States or the State has made an accounting error.  Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to the United States and the State pursuant to Section XVII (Notices and Submissions).  Any such objection shall specifically identify the contested Future Costs and the basis for objection.  In the event of an objection, Countrymark shall within the 30 day period pay all uncontested Future Costs to the United States and the State in the manner described in subparagraph 10b(1).  Simultaneously, Countrymark shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State and remit to that escrow account funds equivalent to the amount of the contested Future Costs.  Countrymark shall send to the United States and the State as provided in Section XVII (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Costs, and a copy of the

13

correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. Simultaneously with establishment of the escrow account, Countrymark shall initiate the Dispute Resolution procedures in Section XI (Dispute Resolution). If the United States or the State prevails in the dispute, within 5 days of the resolution of the dispute, Countrymark shall pay the sums due (with all accrued Interest) to the United States or the State in the manner described in subparagraph 10b(1). If Countrymark prevails concerning any aspect of the contested costs, Countrymark shall pay that portion of the costs (plus associated accrued Interest) for which it did not prevail to the United States or the State in the manner described in subparagraph 10b(1). Countrymark shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XI (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Countrymark's obligation to reimburse the United States and State for Future Costs.

      11.    <u>Non-Compliance with Payment Obligations</u>.

      a. Interest. In the event any payment required by Paragraph 10 is not made when due, Settling Defendant shall pay Interest on the unpaid balance commencing on the payment due date and accruing through the date of full payment.

      b. Stipulated Penalties for Nonpayment. In addition to the Interest required to be paid under the preceding Subparagraph, if any payment required by Paragraph 10 is not made when due, Settling Defendant shall also pay stipulated penalties of $500 per day through the date of full payment.

14

c. Payment of Interest. Any Interest payments under Subparagraph a. of this Paragraph shall be paid to the United States and the State in accordance with the payment instructions set forth in Paragraph 16 below.

d. Settling Defendant shall not deduct any stipulated penalties paid under this Paragraph or Section VII (Stipulated Penalties) in calculating its federal or state income taxes.

### VII.    **STIPULATED PENALTIES**

12.    Except as provided in Paragraph 11 (Non-Compliance with Payment Obligations), Settling Defendant shall be liable to the United States and the State for payment of the following stipulated civil penalties after the date of lodging:

a.    $1,500 per day for each day of violation of Paragraphs 6 (Performance of Restoration Work) of this Consent Decree; and

b.    $1,000 per day for each day of violation for any other violation of this Consent Decree.

13.    All stipulated penalties shall begin to accrue on the day after complete performance is due or the day noncompliance occurs, and shall continue to accrue through the day complete performance occurs or the date complete correction of noncompliance occurs. Stipulated penalties shall accrue regardless of whether the United States or the State have made a demand for payment, but shall not be payable until a written demand for payment is made by the United States or the State, which shall generally describe the noncompliance for which stipulated penalties are demanded.

14.    If Settling Defendant fails to pay stipulated penalties when due, the United States and the State may institute proceedings to collect the penalties, as well as Interest. Settling

Defendant shall pay Interest on the unpaid balance, which shall begin to accrue on the date of a demand for payment made by the United States or the State.

15. Nothing herein shall preclude the simultaneous accrual of penalties for separate violations of this Consent Decree.

16. All stipulated penalties shall be due and payable to the United States and the State within 20 days of Settling Defendant's receipt of a demand for payment of the penalties. All payments of stipulated penalties shall be made as follows:

a. 50% of the stipulated penalty amount shall be paid by certified or cashier's check(s) made payable to the "Treasurer, United States of America," and shall be tendered to the Financial Litigation Unit of the Office of the United States Attorney for the Southern District of Indiana per the instructions to be provided to Settling Defendant. Payment shall be accompanied by a letter indicating that the payment is for stipulated penalties under this Consent Decree, and referencing the case name, civil action number, DOJ Case No. 90-5-1-1-08445, and Federal Project Number TO3001.

b. 50% of the stipulated penalty amount shall be paid by certified or cashier's check(s) made payable to "Cashier, Indiana Department of Environmental Management." Payment shall be tendered to the Indiana Department of Environmental Management, Office of Legal Counsel and shall be accompanied by a letter indicating that the payment is for stipulated penalties under this Consent Decree, with reference to the case name, civil action number, and Countrymark's name and address.

c. Copies of all transmittal letters and checks shall be sent to the United States and the State in the manner provided by Section XVII (Notices and Submissions).

17.     The payment of penalties shall not alter in any way Settling Defendant's obligation to complete the performance of any tasks required under this Consent Decree.

18.     Nothing herein shall preclude the Plaintiffs from seeking additional legal or equitable relief for violation of this Consent Decree or applicable federal or state law, including but not limited to injunctive relief, and civil and criminal sanctions.

19.     Notwithstanding any other provision of this Section, eachPlaintiff may, in its unreviewable discretion, waive any portion of stipulated penalties that are due to it pursuant to this Consent Decree.

### VIII.   ACCESS TO INFORMATION AND DOCUMENT RETENTION

20.     Commencing on the date of lodging of this Consent Decree, Settling Defendant agrees to provide the United States, the State and their representatives, including their contractors, access at all reasonable times to the Site, and to allow such representatives, without restriction, to conduct any activity related to this Consent Decree, including, but not limited to, monitoring implementation, verifying any data or information submitted to the Plaintiffs, and assessing Settling Defendant's compliance with this Consent Decree.  This right of access is in addition to, and shall not limit, any access rights afforded by any law or regulation.

21.     Until four (4) years after termination of this Consent Decree, Settling Defendant shall preserve and retain all records and documents now in its possession or control, or which come into its possession or control, that relate in any manner to:  (i) discharges of oil from Settling Defendant's pipeline into the former ox bow of the Wabash River; (ii) the condition of Natural Resources in the area where the Oil Spill occurred; (iii) the claims alleged in the Complaint; or (iv) Settling Defendant's compliance with this Consent Decree.

17

22.    Upon request, Settling Defendant shall provide to the United States and the State copies of all documents and information within its possession or control (or that of Settling Defendant's contractors or agents) relating to compliance with this Consent Decree. Settling Defendant shall also make available to the United States and the State its employees, agents, or representatives with knowledge of the documents retained pursuant to this Consent Decree and Settling Defendant's compliance with this Consent Decree.

a.    Settling Defendant may assert business confidentiality claims for all or part of the documents or information submitted to the United States and the State under this Consent Decree, to the extent permitted by and in accordance with 40 C.F.R. Part 2 and applicable state law. For any documents or information determined to be confidential by the United States and/or the State, such documents will be afforded confidentiality protection in accordance with 40 C.F.R. Part 2, Subpart B and the applicable state law. If no claim of confidentiality accompanies documents or information when they are submitted to the United States and the State, the public may be given access to such documents or information without further notice in accordance with 40 C.F.R. Part 2, Subpart B and applicable state law.

b.    Settling Defendant may assert that certain documents and information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Settling Defendant asserts such a privilege in lieu of providing documents, Settling Defendant shall provide the United States and the State with the following:  (i) the title of the document; (ii) the date of the document; (iii) the name and title of the author of the document; (iv) the name and title of each addressee and recipient; (v) a description of the contents of the document; and (vi) the privilege asserted by Settling Defendant. No documents or information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they

18

are privileged.

## IX. **INDEMNIFICATION**

23.   The United States and the State do not assume any liability by entering into this Consent Decree or by virtue of any activities to be performed by the Settling Defendant under this Consent Decree.  Settling Defendant waives all claims against the United States and the State for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State, arising from or on account of any contract, agreement or arrangement between the Settling Defendant and any person for performance of the Restoration SOW including, but not limited to, claims on account of construction delays.

24.    Settling Defendant shall indemnify, save and hold harmless the United States and the State and their officials, agents, employees, contractors, subcontractor or representatives for or from any and all claims or causes of actions arising from, or on account of, acts or omissions of Settling Defendant, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Consent Decree.  Further, Settling Defendant agrees to pay the United States and the State all costs incurred including, but not limited to, attorney's fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States or the State based on acts or omissions of Settling Defendant, their officers, directors, employees, agents, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Consent Decree.

25.    The United States and the State shall not be a party to any contract entered into by or on behalf of Settling Defendant in carrying out activities pursuant to this Consent Decree. Neither Settling Defendant nor any contractor hired by them shall be considered an agent of the

United States or the State. The United States' liability shall be governed by the Federal Tort Claim Act, 28 U.S.C. §1346. The State's liability shall be governed by the provision of the Indiana Tort Claims Act, Indiana Code 34-13-3, and other applicable law.

## X. <u>FORCE MAJEURE</u>

26.     "Force Majeure Event" is defined as any event arising from causes entirely beyond the control of Settling Defendant or of any entity controlled by Settling Defendant, including, but not limited to, its contractors and subcontractors, that delays or prevents the performance of any obligation under this Consent Decree despite Settling Defendant's best efforts to fulfill the obligation. "Best efforts" to fulfill an obligation includes using best efforts to anticipate any potential Force Majeure Event and to address and mitigate the effects of any such event (1) as it is occurring, and (2) following the event, in such a way that the resulting delay is minimized to the greatest extent possible. Financial inability to fulfill any obligation under this Consent Decree does not constitute a Force Majeure event.

27.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a *Force Majeure* event, Settling Defendant shall orally notify the Natural Resource Trustee Project Coordinator, designated pursuant to Paragraph 7, within 48 hours of when Settling Defendant first knew or should have known that the event might have caused a delay. Within seven (7) days thereafter, Settling Defendant shall provide to the Natural Resource Trustee Project Coordinator a written detailed description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay and/or the effect of the delay; and the Settling Defendant's rationale for attributing such delay to a *Force Majeure* event if it intends to assert

20

such a claim.  The Settling Defendant shall include with any notice all available documentation supporting its claim that the delay was attributable to a *Force Majeure* event.  Failure to comply with the above requirements shall preclude the Settling Defendant from asserting any claim of *Force Majeure* for that circumstance for the period of time of such failure to comply, and for any additional delay caused by such failure.  Settling Defendant shall be deemed to have notice of any circumstances of which their contractors or subcontractors had or should have had notice.

28.     If the Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure Event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure Event will be extended by the Plaintiffs for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure Event shall not, of itself, extend the time for performance of any other obligation.  If the Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure Event, the Plaintiffs will notify the Settling Defendant in writing of their decision.  If the Plaintiffs agree that the delay or anticipated delay has been or will be caused by a Force Majeure Event, the Plaintiffs will notify the Settling Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure Event.

29.     If the Settling Defendant elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution) to resolve a dispute under this Section, it shall do so no later than 15 days after receipt of the Plaintiffs' notice.  In any such proceeding, Setting Defendant shall have the burden of demonstrating by a preponderance of the evidence that (i) the delay or anticipated delay has been or will be caused by a Force Majeure Event, (ii) the duration of the delay or the extension sought was or will be warranted under the circumstances, (iii) best

efforts were exercised to avoid and mitigate the effects of the delay, and (iv) Settling Defendant

complied with the requirements of the preceding Subparagraphs.  If Settling Defendant meets

this burden, the delay at issue shall be deemed not to be a violation by Settling Defendant of the

affected obligation of this Consent Decree.

## XI. **DISPUTE RESOLUTION**

30.      Unless otherwise provided for in this Consent Decree, the dispute resolution

procedures of this Section shall be the exclusive mechanism for resolving disputes arising under

this Consent Decree and its Appendix.  The procedures set forth in this Section shall not apply to

actions by the United States or the State to enforce Settling Defendant's obligations that have not

been disputed in accordance with this Section.

a.  Informal Dispute Resolution.  Any dispute under this Paragraph shall in the

first instance be the subject of informal negotiations between the parties to the dispute.  The

dispute shall be considered to have arisen when one party sends the other parties a written Notice

of Dispute.  The period for informal negotiations shall not exceed 20 days from the time the

dispute arises, unless it is modified by written agreement of the parties to the dispute.

b.  Formal Dispute Resolution.  In the event that the parties cannot resolve any

dispute under this Paragraph by informal negotiations, the formal dispute procedures outlined by

this Subparagraph shall apply.

(1) The position advanced by the Plaintiffs shall be considered binding unless,

within fifteen working days after the conclusion of the informal negotiation period, the Settling

Defendant invokes formal dispute resolution procedures by serving on the Plaintiffs, in

accordance with Section XVII (Notices and Submissions), a written Statement of Position on the

matter in dispute which shall include or attach any factual data, analysis, opinion or

documentation that the Settling Defendant relies upon in support of its position.

(2) Following receipt of Settling Defendant's Statement of Position, the Plaintiffs will issue an administrative decision resolving the dispute which shall include or attach any factual data, analysis, opinion, or documentation supporting the decision. The Plaintiffs shall compile and maintain an administrative record of the dispute containing the Settling Defendant's Statement of Position and the Plaintiffs' administrative decision. The Plaintiffs' administrative decision shall be binding on the Settling Defendant unless, within 10 days of receipt of the decision, the Settling Defendant files with the Court and serves on the parties a motion for judicial review of the Plaintiffs' administrative decision, based on the administrative record compiled and maintained by the Plaintiffs. Any such motion filed by the Settling Defendant shall set forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree. The Plaintiffs shall provide the Court a copy of the administrative record of the dispute, and may file a response to Settling Defendant's motion.

c. Effect of Invoking Dispute Resolution. The invocation of dispute resolution procedures under this Paragraph shall not extend, postpone, or affect in any way any obligation of Settling Defendant under this Consent Decree, not directly in dispute, unless the Court determines otherwise. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute. In the event that the Settling Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties) of this Consent Decree.

## XII. COVENANT NOT TO SUE BY THE UNITED STATES

31. In consideration of satisfactory performance of Settling Defendant's obligations under the terms of this Consent Decree, and except as provided in Paragraphs 33 and 34 (Reservation of Rights by the United States and the State) below, the United States, on behalf of the Federal Trustees and the U.S. Coast Guard, hereby covenants not to sue or take administrative action against Settling Defendant for Natural Resource Damages with respect to the Oil Spill and for Future Costs as defined herein. This covenant not to sue shall take effect upon the date of Entry of this Consent Decree, except that this covenant not to sue is conditioned upon the issuance to Settling Defendant of a certification of completion of construction pursuant to Paragraph 9 and satisfaction of payment obligations under Paragraph 10. This covenant not to sue applies only to Natural Resource Damages and Future Costs resulting from or, based on, the Oil Spill as defined herein, and extends only to Settling Defendant.

## XIII. COVENANT NOT TO SUE BY THE STATE OF INDIANA

32. In consideration of satisfactory performance by Settling Defendant of its obligations under this Consent Decree, and except as provided in Paragraphs 33 and 34 (Reservation of Rights by the United States and the State) below, the State, on behalf of IDEM and IDNR, covenants not to sue or take administrative action against the Settling Defendant for Natural Resource Damages with respect to the Oil Spill and for Future Costs as defined herein. This covenant not to sue shall take effect upon the date of Entry of this Consent Decree, except that this covenant not to sue is conditioned upon the issuance to Settling Defendant of a certification of completion of construction pursuant to Paragraph 9 and satisfaction of payment obligations pursuant to Paragraph 10. This covenant not to sue applies only to Natural Resource Damages resulting from or, based on, the Oil Spill as defined herein, and extends only to the Settling

24

Defendant.

## XIV.  RESERVATIONS OF RIGHTS BY THE UNITED STATES AND THE STATE

33.  Reservation of Rights.  The covenants not to sue set forth above pertain only to those matters expressly specified in Paragraphs 31 and 32.  The United States and the State reserve, and this Consent Decree is without prejudice to, all rights against Settling Defendant with respect to all other matters, including but not limited to:

a.  claims based on a failure by Settling Defendant to meet a requirement of this Consent Decree;

b.  liability for costs incurred or to be incurred by the Plaintiffs that are not within the definition of the State Assessment Costs, DOI Assessment Costs or NPFC Assessment Costs;

c.  liability for any corrective action, response or removal activity, response or removal costs or any other cleanup or regulatory action arising from or based on the Oil Spill pursuant to the Resource Conservation and Recovery Act, Comprehensive Environmental Response, Compensation and Liability Act, the Clean Water Act, or any other applicable federal or state law as a result of the release or threatened release of any hazardous substance or discharge of oil arising from or based on the Oil Spill;

d.  liability arising from the past disposal, release or threat of release of hazardous substances or discharges of oil arising from anything other than the Oil Spill;

e.  liability arising from any future disposal, release or threat of release of hazardous substances or discharges of oil arising from the Oil Spill;

f.  liability for any matter for which the United States or the State is owed indemnification under Section IX of this Consent Decree;

g.  criminal liability;

25

      h. claims brought on behalf of the United States including the United States Coast Guard, and the Oil Spill Liability Trust Fund, for costs, damages and expenses of any sort, other than for injuries to Natural Resources under OPA § 1002(b)(2)(A), 33 U.S.C. § 2702(b)(2)(A), arising from the Oil Spill; and

      i. liability for violations of federal or state law which occur after entry of this Consent Decree.

34. <u>Reservations Concerning Unknown Natural Resource Injury</u>. Notwithstanding any other provision of this Consent Decree, the United States and the State reserve the right to institute proceedings against Settling Defendant in this action or in a new action seeking recovery of Natural Resource Damages, based on: (1) conditions with respect to the Oil Spill, unknown to DOI, FWS, IDEM, and IDNR at the date of lodging of this Consent Decree, that result in the discharge of oil or release of hazardous substances that contribute to the injury to, destruction of, or loss of Natural Resources, or (2) information received after the date of lodging of the Consent Decree which indicates that there is injury to, destruction of, or loss of Natural Resources of a type that was unknown, or of a magnitude greater than what was known, to the Natural Resource Trustees or NPFC at the date of lodging of this Consent Decree.

35. <u>Rights of non-parties</u>. Nothing in this Consent Decree is intended as a covenant not to sue or a release from liability for any persons or entities not parties to this Consent Decree. The United States and the State expressly reserve all claims, demands, and causes of action, either judicial or administrative, past or future, in law or equity, against any person or entity not a party to this Consent Decree for any matter arising at or in any way relating to any discharge of oil or releases of hazardous substances arising from or based on the Oil Spill.

36. The failure of the United States and the State to insist upon strict and prompt

performance of any provision of this Consent Decree shall not operate as a waiver of any requirement of this Consent Decree or of the United States' and the State's right to insist on prompt compliance in the future with such provision, and shall not prevent a subsequent action by the United States and the State to enforce such a provision.

37.     This Consent Decree does not limit the authority of the United States or the State to undertake any action in response to conditions which may present an imminent and substantial endangerment to public health, welfare, or the environment.

## XV.  COVENANT BY SETTLING DEFENDANT

38.  The Settling Defendant hereby covenants not to sue or assert any claim or cause of action against the Plaintiffs, their employees, agents, experts or contractors under OPA, the CWA, or any other federal or state law or regulation with respect to this Consent Decree, the Oil Spill, or assessment activities in connection with the Oil Spill, including without limitation, any direct or indirect claim for reimbursement under any provision of federal or state law.  In addition, Settling Defendant agrees that it will not raise as a defense, or assert in any other manner, in any proceeding for recovery of costs, damages, and/or expenses of any sort arising from the Oil Spill, that the Plaintiffs did not include such claims in the Complaint initiating this action.

## XVI.  EFFECT OF SETTLEMENT

39.  Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.  The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this Consent Decree may have under applicable law.  Each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes

of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Oil Spill against any person not a party hereto.

40. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, recovery of response costs, or other appropriate relief relating to the Oil Spill, Settling Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defense based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Sections XII, XIII, and XIV (Covenants Not to Sue and Reservation of Rights by the United States and the State).

## XVII. NOTICES AND SUBMISSIONS

41. Whenever, under the terms of this Consent Decree, written notice is required to be given or a report or any other document is required to be sent by one Party to another, it shall be directed to individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing. All notices and submissions shall be considered effective upon receipt, unless otherwise provided.

As to the United States

> United States Department of Justice:
> Chief, Environmental Enforcement Section
> Environment and Natural Resource Division
> U.S. Department of Justice (DJ# 90-5-1-1-08445)
> P.O. Box 7611
> Washington, D.C. 20044-7611
>
> United States Coast Guard:
> CDR Thomas Beistle, Chief

United States Coast Guard, Office of Claims and Litigation
2100 Second Street, S.W.
Washington, D.C. 20593-0001
Attn: FPN T03001

and

Lieutenant Commander David Dubay, Legal Advisor
United States Coast Guard, National Pollution Funds Center/CI
4200 Wilson Boulevard, Suite 1000
Washington, D.C. 22203-1804
Attn: FPN T03001

United States Fish and Wildlife Service:
 Thomas Melius
 Regional Director
 U.S. Fish and Wildlife Service
 Bishop Henry Whipple Federal Building
 1 Federal Drive
 Fort Snelling, MN 55111

United States Department of Interior
Kimberly Gilmore
U.S. Department of the Interior
Office of the Solicitor
Three Parkway Center, Room 385
Pittsburgh, PA 15220

As to the State:

Indiana Department of Natural Resources
Attn: John Davis, Deputy Director
Indiana Government Center South, Room 256C
402 West Washington Street
Indianapolis, IN 46204

Indiana Department Environmental Management
Office of General Counsel
Attn: Beth Admire, Program Counsel Section Chief
100 N. Senate Avenue
MC 60-01, IGCN 1307
Indianapolis, IN 46204-2251

Patricia Orloff Erdmann
Chief Counsel for Litigation

Indiana Attorney General's Office
Indiana Government Center South
402 West Washington Street, Fifth Floor
Indianapolis, IN 46204

<u>As to Countrymark</u>:

Joe A. Sudholt
1200 Refinery Road
Mt. Vernon, Indiana 47620-9225

## XVIII. <u>LODGING AND OPPORTUNITY FOR PUBLIC COMMENT</u>

42.  The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to a thirty-day (30) period for public notice and comment in accordance with Department of Justice policy and 28 C.F.R. 50.7.  The United States and the State reserve the right to withdraw or withhold their consent if comments regarding the Consent Decree disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate.  Settling Defendant hereby consents to the entry of this Consent Decree without further notice, and agrees not to challenge any provision of this Consent Decree unless the United States and the State have notified Settling Defendant in writing that they no longer support entry of the Consent Decree.

## XIX. <u>SIGNATORIES/SERVICE</u>

43.  Each undersigned representatives of Settling Defendant, the State and the United States certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

44.  The Settling Defendant shall identify, on the attached signature page, the name, address and telephone number of an agent(s) who is (are) authorized to accept service of process by mail on behalf of the Settling Defendant with respect to all matters arising under or relating to

30

this Consent Decree. Settling Defendant hereby agrees to accept service in that manner and to

waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure

and any applicable local rules of this Court, including, but not limited to, service of a summons.

## XX. **EFFECTIVE DATE**

45. The Effective Date of this Consent Decree shall be the date upon which this Consent

Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever

occurs first, as recorded on the Court's docket; provided, however, that Settling Defendant

hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective

Date. In the event the United States withdraws or withholds consent to this Consent Decree

before entry, or the Court declines to enter the Consent Decree, then the preceding requirement

to perform duties scheduled to occur before the Effective Date shall be terminated.

## XXI. **TERMINATION**

46. This Consent Decree shall terminate when Settling Defendant has (a) made all of the

payments required by this Consent Decree, including any stipulated penalties, and (b) the Natural

Resource Trustees have issued a Construction Completion Certification for the Restoration

Project.

## XXII. **APPENDICES**

47. The following appendix is attached to and incorporated into this Consent Decree:

"Appendix A," the New Harmonie State Park Statement of Work.

## XXIII. **RETENTION OF JURISDICTION**

48. This Court shall retain jurisdiction to modify and enforce the terms of and

conditions of this Consent Decree and to resolve disputes arising hereunder as may be necessary

or appropriate for the execution of this Consent Decree.

## XXIV. __MODIFICATION__

49.    Any material modification of this Consent Decree shall be made in writing by agreement of the Parties to this Consent Decree, and shall not take effect unless approved by the Court. Modifications that do not materially alter Settling Defendant's obligations under this Consent Decree may be made without consent of this Court by written agreement of the Parties.

50. Unanticipated or increased costs or expenses associated with the implementation of actions called for by this Consent Decree and economic hardship or changed financial circumstances shall not serve as a basis for modifications of this Consent Decree.

## XXV. __FINAL JUDGMENT__

51.    This Consent Decree and  Appendix A attached hereto constitute the final, complete, and exclusive understanding among the Parties with respect to the settlement embodied in the Consent Decree.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

52.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States, the State and the Settling Defendant.  The Court                                therefore enters this judgment as a final judgment under Fed. R. Civ. P.        58.

Date:  11/02/2009


_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

32

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of United States v. Countrymark Cooperative, L.L.P. (S.D. Ind.)

FOR THE UNITED STATES OF AMERICA

Date: 7/29/09

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division

Date: 7/29/09

RENITA FORD
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0232
Fax: (202) 514-8395
renita.ford@usdoj.gov

TIMOTHY M. MORRISON
United States Attorney

Date: 8/13/09

THOMAS E. KIEPER
Assistant United States Attorney
Southern District of Indiana
10 W. Market Street, Suite 2100
Indianapolis, IN 46204-3048
Tel: (317) 226-6333
Fax: (317) 226-5027
Tom.Kieper@usdoj.gov

33

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of United States v. Countrymark Cooperative, L.L.P.

FOR THE STATE OF INDIANA

INDIANA DEPARTMENT OF NATURAL RESOURCES

Date: 3-31-09

John M. Davis
Deputy Director
Indiana Department of Natural Resources
IDNR, Indiana Government Center South
402 West Washington Street, W255
Indianapolis, IN 46204

INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

Date: 4/7/2009

ELIZABETH ADMIRE
Program Counsel Section Chief
Office of General Counsel
Indiana Department of Environmental Management
100 N. Senate Avenue
MN 60-01-IGCN 1307
Indianapolis, IN 46204-2251

GREG ZOELLER
Attorney General of Indiana
Att. No. 1958-98

Date: 4/7/2009   by:

Timothy J. Junk, Dep. Atty. Gen.
Att. No. 5587-02,
Indiana Attorney General's Office
Indiana Government Center South
302 West Washington Street, Fifth Floor
Indianapolis, IN 46204

34

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of United States v. Countrymark Cooperative, L.L.P. (S.D. Ind.)

FOR THE SETTLING DEFENDANT

Signature:

JOHN T. DEATON, Senior Vice President
1200 Refinery Road
Mt. Vernon, Indiana 47620-9225

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Signature:

JOE A. SUDHOLT, ▬▬▬ Vice President
1200 Refinery Road
Mt. Vernon, Indiana 47620-9225

Appendix A - Statement of Work

**CountryMark-Orphan Well Plugging New Harmonie State Park - Posey County**

## I. PURPOSE

This Appendix A sets forth the requirements for plugging orphan wells pursuant to the Consent Decree and Statement of Work. The wells that shall be addressed are as follows (excluding wells on Mink Island):

>    5 S, 14 W, Section 14 - (2 wells)

   1834 Willis, Hickam & Elliott #1 5500 Elmer Elliott #19

>    5 S, 14 W, Section 22 - (1 well)

   5029 Elmer Elliott #8-A

>    5 S, 14 W, Section 23 - (10 wells)

   3480 Elmer Elliott #2
   3580 E.E. Elliott #1-A
   3649 Elmer E. Elliot #5
   3826 Elmer E. Elliott #4-A
   3837 Elmer E. Elliott #1-A
   4003 E.E. Elliott #11-A
   5061 Elmer E. Elliott #9-A
   25128 Elmer E. Elliott #6
   26014 Brehm-Elliott #3-W
   32965 Morton Elliott #1

Countrymark shall perform plugging activities Monday through Friday, excluding state and federal holidays, between the hours of 7:30 a.m. and 5:30 p.m., unless prior approval is received from the on-site Inspector. Countrymark shall not interrupt or disturb park operations in any way while performing well plugging activities.

**Standard Plugging Procedures:**

Countrymark shall implement the following procedures for <u>all</u> wells:

1.    locate the well and prepare the site for plugging. Site preparation shall include, but not be limited to, mobilization and set up of equipment, excavation of the access road leading from the main road to the well, and uncovering the well head.

2.    transfer excess fluids from the well to the tank truck. Fluids may be temporarily stored in a (lined) pit with Division approval. Once plugging is complete, Countrymark shall remove any fluids stored in the pit from the site and fill the pit in with uncontaminated soil.

3.    clean out the well to total depth and remove any obstructions or unauthorized material in hole before plugging.

4.    run cement bond log to determine depths of cement in annulus.

5.    run tested string of tubing to circulate well oil and brine water out of well.

6.    circulate oil and brine out of well.

7.    set a Cast Iron Bridge Plug and top with 10 gallons of cement slurry to secure plug in place. Plug placement will differ on each well depending on total depth, underground drinking water zones and minable coal seams. All depths of plugs are listed for each individual well below.

8.    intermediate plugs may be required when more than one zones are opened. If needed, set a Cast Iron Bridge Plug and top with 10 gallons of cement slurry to secure plug in place. Plug placement will differ on each well depending on the number of open producing zones and at what depth they are located.

9.    fill with acceptable fluid (drilling mud, fresh water, or gel) from bottom plug to top plug.

10.    set cement top plug and cement (perforate or remove casing if necessary to circulate) back to surface. Depths of top plugs will vary depending on depth of water zones and coal mine strings. Fallback of a top plug may be topped off by surface placement of cement slurry.

11.    cut off and remove casing at least 3' below surface.

12.    weld metal plate to top of casing.

13.    remove all oil related materials and restore site to original contour. Within Six (6) months after plugging a well, the Countrymark shall:

        a.  remove substructures;
        b.  clear the well site of refuse, oil field related materials and equipment;

    c.  remove and dispose of waste fluids from the well site;

    d.  fill in all excavated area and return area to original contours; and

    e.  restore the well site to its condition before drilling.

Countrymark shall not plug a well unless a Division representative is present to witness the plugging. If Countrymark plugs a well without a Division representative present, Countrymark may be required by the Division to drill out and plug the well in the presence of a Division representative. Notwithstanding these limitations on plugging wells without a representative of the Division present, Countrymark may clean a well out, dig pits, run or pull casing, and clean up the well area without a Division representative being present.

-3-

**STANDARDS:**

Salvage Rights: All equipment and materials removed in the course of the performance of the work under the Consent Decree and Statement of Work shall become the property of Countrymark, and Countrymark shall remove such materials and equipment from the site.

Countrymark shall be responsible for verifying the location of existing underground utilities and structures within the site limits, including utility pipes, buried cables and wires or structures. Countrymark shall notify any affected utility companies in writing at least seventy-two (72) hours prior to the start of construction.

A Division of Oil and Gas Inspector will witness the plugging (cementing) and provide a Plugging Affidavit once the well is correctly plugged and abandoned.

**PIT Abandonment Procedure:**

Countrymark shall reclaim and restore the site of the wells and pits in a manner that will protect the waters and lands of the state against pollution. Pits shall be filled with uncontaminated soil or fill dirt and leveled. Oil soaked soil must be solidified and removed from the site and taken to a solid waste landfill. Countrymark shall:

      A.     transfer excess fluids from the pit into thetank truck and properly dispose of all waste oil, saltwater, and debris associated with the pit. (Note: Upon request, IDEM may approve surface discharge of fluids if they are low in TDS. If not, fluid will need to be solidified and taken to a qualified landfill for disposal.

      B.     excavate the pit area and solidify and oil soaked soil with dry cement.

      C.     push in walls of the pit and the back fill area to re-grade the hill until the contours are sloped towards the drainage ditch beside the road or the drainage flows away from site; and restore the surface area to blend with the terrain. If necessary, Countrymark shall top the area with clean soil or fill dirt.

**Materials:**

**Cast Iron Bridge Plugs (CIBP) :** Countrymark shall set Cast Iron Bridge Plugs in lieu of cement bottom plugs since the oil and gas zones under the park are highly pressured and the CIPB will hold better and for longer than cement plugs. Most of the wells when opened will have fluids flow to the surface and will require the use of CIBP to stop the flow. Because of the proximity to the Wabash River, this extra precaution of using CIPB will provide better protection to the environment and groundwater. A mechanical CIBP must be set inside cemented casing above the uppermost completed zone and topped with a ten (10) gallon cement plug placed on top of the CIBP. The mechanical plug must meet American Petroleum Institute (API) specifications.

**Cement:** Cement must meet American Petroleum Institute (API) 10 (A) or American Society for Testing and Materials (ASTM) Specification C150 Standards for Portland cement. If a pozzalan cement mixture is used, the pozzalanic content by volume must not exceed fifty percent (50%). The average weight of cement must be no less than: 13 Ibs. per gallon. The approved

-4-

methods used to set cement plugs are dump bailing on top of a CIBP and the pump and plug or displacement through tubing, coiled tubing or drill pipe. Surface pumping or bullhead plugging is allowed only if placing a plug from total depth to surface.

**Acceptable materials to fill uncemented intervals of casing:** Uncemented intervals of casing between plugs may be filled with pea gravel, crushed rock, drilling mud, gel, or fresh water. Countrymark shall remove, rip or perforate and cement in place uncemented casing.

**Cement Bond Logs:** When completion reports do not clearly show cementing data, Countrymark shall run a Cement Bond log on the well to determine where cement has been placed in the annulus. Standard calculations used to determine cement fill up are not always accurate because type of cement and chemical additives are not indicated in well records. If Countrymark chooses to perforate and squeeze uncemented casing without running a bond log, Countrymark shall perform such work every fifty (50) feet until cement circulation is obtained. When the completion report does not indicate the amount of cement used, Countrymark shall run a bond log.

**Reclaiming the area:** Countrymark shall replace vegetation by reseeding the surface areas. This may not be needed on all well sites as wells are located in the woods and not in an area open to the public. Growth will occur naturally. The site shall be excavated to blend in with the natural contours of the land. Countrymark shall remove from the site all refuse and oil and gas equipment and materials.

-5-

## PLACEMENT OF PLUGS AND TECHNICAL DATA
## ON INDIVIDUAL WELLS: Section 14

### Elmer Elliott #19, Permit # 5500, Twp. 5S, Rngo 14W, Sec. 14

Technical Data:

| | |
|---|---|
| Casing: | Surface - 10 ¾" to 117' (cement circulated) Long String - 7" to 429' (cemented to 1,722') |
| Total Depth: | 2439' |
| Well Type: | oil USDW: 252' |
| Coal Seams: | 469-794' (3 coal seams) |
| Producing Zones: | 2425-2439' |

**Bottom plug: CIBP to be set at 2400'**
**Top cement plug to be set and circulated from 847' to surface.**

Comments: Both strings of casing cemented with 100 sacks each.

### Hickam-Elliott #1, Permit # 1834, Twp. 5S, Rng. 14W, Sec. 14

Technical Data:

| | |
|---|---|
| Casing: | Surface - 10 ¾" to 191' Long String - |
| Total Depth: | 3084' |
| Well Type: | oil USDW: 242' |
| Coal Seams: | 432-738' Elevation: 466' |

**Bottom Plug: Set a CIBP at 2980'**
**Top Plug: set and circulated at a depth of 788' to surface**

Comments: Well may have been deepened since Completion Report was submitted in 1942. No cementing information or record of long string casing on Completion Report. Records do not indicate how deep the long string of casing was run. This well may even be plugged; an attempt to locate and uncover should be made to verify it's status.

### SECTION 23

### E.E. Elliott #2, Permit # 3480, Twp. 5S, Rng. 14W, Sec. 23

Technical Data:

| | |
|---|---|
| Casing: | Surface- 10" to 112' |
| | Long String - 7" to 2402' (150 sacks-Estimated Cement top=1059') |
| Total Depth: | 2438' |
| Well Type: | oil USDW: 234' |
| Coal Seams: | 451-713' |

|   |   |
|---|---|
| Elevation: | 441' |
| Producing Zone: | 2404-2415' |

**Bottom Plug: set a CIBP at 2350'**
**Top Plug: set and circulate a cement plug at a depth of 755' to surface**

Comments:

### Elmer Elliott #l-A, Permit # 3580, Twp. 5S, Rng. 14W, Sec. 23

Technical Data:

|   |   |
|---|---|
| Casing: | Surface - 10" to 68' |
|  | Long String - 7" to 2022' |
| Total Depth: | 2380'; Plugged back to 2071' Packer may be set at 2011' & 1940' |
| Well Type: | oil USDW: 237' |
| Coal Seams: | 451-656' |
| Elevation: | 384' |
| Producing Zone: | 2027-2045' & 1867'-1870' |

**Bottom Plug: set a CIBP at 2010'**
**Intermediate Plug: set a CIBP at 1800' and top with cement**
**Top Plug: set and circulate a cement plug at a depth of 755' to surface**

Comments: Records do not indicate how much cement was used when setting casing.
Recommend running Cement Bond Log.

Also, the packer, set at 2011' and 1940' may have been set just for testing the well and may have been removed already.

### Elmer Elliott #5, Permit # 3649, Twp. 5S, Rng. 14W, Sec. 23

Technical Data:

|   |   |
|---|---|
| Casing: | Surface - 10" to 72' |
|  | Long String - 7" to 2122' Total Depth: 2180' |
| Well Type: | oil USDW: 235' |
| Coal Seams: | 452-639' Elevation: 367' |
| Producing Zone: | 2127-2163' |

**Bottom Plug: set a CIBP at 2100'**
**Top Plug: set and circulate a cement plug at a depth of 689' to surface**

Comments: Records do not indicate how much cement was used when setting casing.
Recommend running Cement Bond Log.

-7-

**Elmer Elliott #4-A, Permit # 3826, Twp. 5S, Rng. 14W, Sec. 23** Technical Data:

| | |
|---|---|
| Casing: | Surface- 10 3/4" to 103' |
| | Long String - 7" to 2121' |
| Total Depth: | 2167' |
| Well Type: | oil |
| USDW: | 237' |
| Coal Seams: | 449-641' |
| Elevation: | 369' |
| Producing Zone: | 2149-2167, 2121-2133 & 1852-1857' |

**Bottom Plug: set a CIBP at 2140'**
**Intermediate Plugs: set a CIBP at 2105' and at 1830'**
**Top Plug: set and circulate a cement plug at a depth of 700' to surface**

Comments: Records do not indicate how much cement was used when setting casing.
Recommend running Cement Bond Log.

**Elmer Elliott #l-A, Permit # 3837, Twp. 5S, Rng. 14W, Sec. 23**

Technical Data:

| | |
|---|---|
| Casing: | Surface - 10 3/4" to 70' |
| | Long String - 5.5" to 1820' Total Depth: 1849' |
| Well Type: | oil USDW: 240' |
| Coal Seams: | 449-660' Elevation: 388' |
| Producing Zone: | 1830-1846' |

**Bottom Plug: set a CIBP at 1800'**
**Top Plug: set and circulate a cement plug at a depth of 710' to surface**

Comments: Records do not indicate how much cement was used when setting casing.
Recommend running Cement Bond Log.

**Elmer Elliott #11-A, Permit # 4003, Twp. 5S, Rng. 14W, Sec. 23** Technical Data:

| | |
|---|---|
| Casing: | Surface - 10" to 72' |
| | Long String - 7" to 1342' Total Depth: 1360' |
| Well Type: | oil USDW: 243' |
| Coal Seams: | 438-649' Elevation: 377' |
| Producing Zone: | 1342-1360' |

**Bottom Plug: set a CIBP at 1300'**

-8-

**Top Plug: set and circulate a cement plug at a depth of 700' to surface**

Comments: No cementing records for this well.

### Elmer Elliott #9-A, Permit # 5061, Twp. 5S, Rng. 14W, Sec. 23

Technical Data:

| | |
|---|---|
| Casing: | Surface- 10 3/4" to 86' (100 sacks-Cement Circulated) |
| | Long String - 7" to 1334' (150 sacks- Estimated Cement Top = 274') Total Depth: 2365', Plugged back to 1387' |
| Well Type: | oil USDW: 242' |
| Coal Seams: | 437-646' |
| Elevation: | 374' |
| Producing Zone: | 1338-1372' |

**Bottom Plug: set a CIBP at 1300'**
**Top Plug: set and circulate a cement plug at a depth of 700' to surface**

Comments:

### Elmer Elliott #6, Permit # 25128, Twp. 5S, Rng. 14W, Sec. 23

Technical Data:

| | |
|---|---|
| Casing: | Surface- 10"to73' |
| | Long String - 5 ½" to 2350' (150 sacks-Estimated Cement Top = 1041 ') Total Depth: 2367' |
| Well Type: | Water Injection |
| USDW: | 241' |
| Coal Seams: | 437-638' |
| Elevation: | 366' |
| Producing Zone: | 2354-2367' |

**Bottom Plug: set a CIBP at 2300'**
**Top Plug: set and circulate a cement plug at a depth of 690' to surface**

Comments:

### Elmer Elliott # 3 - W, Permit # 26014, Twp. 5S, Rng. 14W, Sec. 23

Technical Data:

| | |
|---|---|
| Casing: | Surface - 10 ¾" to 92' (125 sacks-Cement Circulated) |
| | Long String - 5 W' to 2399' (200 sacks-Estimated Cement Top = 1173') |
| Total Depth: | 2401' |

| | |
|---|---|
| Well Type: | Water Injection |
| USDW: | 244' |
| Coal Seams: | 449-689' |
| Elevation: | 408' |
| Producing Zone: | 2388-2392' |

**Bottom Plug: set a CIBP at 2350'**
**Top Plug: set and circulate a cement plug at a depth of 740' to surface**

Comments:

**Morton Elliott l-W, Permit # 32965, Twp. 5S, Rng. 14W, Sec. 23** Technical Data:

| | |
|---|---|
| Casing: | Surface - 10 3/4" to 102' (Cement Unknown) |
| | Long String - 5 1/2" to 1420' (100 Sacks-Estimated Cement Top = 471') Total Depth: 2880' Plugged Back to 1360' |
| Well Type: | Water Injection USDW: 244' |
| Coal Seams: | 441-658' |
| Elevation: | 373' |
| Production Zone: | 1350-1366' |

**Bottom Plug: set a CIBP at 1300'**
**Top Plug: set and circulate a cement plug at a depth of 710' to surface**

Comments:

**Elmer Elliott 8-A, Permit # 5029, Twp. 5S, Rng. 14W, Sec. 22**

Technical Data:

| | |
|---|---|
| Casing: | Surface - 10 3/4" to 30' (75 sacks-Cement circulated) |
| | Long String- 7" to 2341' (100 sacks-Estimated Cement top=1646') |
| Total Depth: | 2352 |
| Well Type: | Oil USDW: 243' |
| Coal Seams: | 446-649' |
| Elevation: | 362' |
| Producing Zone: | 2035-2341' & 1829-1851' |

**Bottom Plug: set a CIBP at 2015' and top with 10 gal. cement Intermediate Plug: Set a CIBP at 1800' and top with 10 gal. cement Top Plug: set and circulate a cement plug at a depth of 700' to surface**

Comments:

-10-